# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-CC-00043-SCT

*ST. DOMINIC-JACKSON MEMORIAL HOSPITAL AND MISSISSIPPI BAPTIST MEDICAL CENTER*

*v.*

*MISSISSIPPI STATE DEPARTMENT OF HEALTH AND METHODIST MEDICAL CENTER, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/08/94 |
| TRIAL JUDGE: | HON. PATRICIA WISE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | EDMUND L. BRUNINI, JR. |
| | JAMES D. KOPERNAK |
| | JAMES T. COX |
| ATTORNEYS FOR APPELLEES: | RICKY L. BOGGAN |
| | LAURA H. TEDDER |
| | ELLEN M. DAVIS |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED, RENDERED AND REMANDED - 10/8/1998 |
| MOTION FOR REHEARING FILED: | 10/22/98 |
| MANDATE ISSUED: | 4/12/99 |

**EN BANC.**

**PRATHER, CHIEF JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1. On November 17, 1992, Methodist Medical Center (hereinafter "MMC") filed a Certificate of Need Application (CON) with the Mississippi State Department of Health (hereinafter "the Department") to establish what it called a Primary Care Center (also referred to as the "North Campus") in northeast Jackson. MMC's CON application was followed by public hearings requested by St. Dominic-Jackson Memorial hospital (hereinafter St. Dominic), Mississippi Baptist Medical Center (hereinafter MBMC), and Woman's Hospital, all of which opposed MMC's application. [1]

¶2. During the first CON hearing, the Department conducted a review of MMC's application and determined that the CON should be granted. The Staff of the Health Planning Division of the Department

subsequently issued a seventeen page report recommending approval. Thereafter, an eight-day hearing was held with regard to MMC's CON application. At the conclusion of the hearing, the hearing officer endorsed the proposal and recommended that the CON application be granted, subject to MMC agreeing to minimum conditions relating to indigent and medicare care. State Health Officer, Dr. F. E. Thompson, then reviewed the entire record and concurred in the Staff's and hearing officer's recommendation by approving MMC's application by Final Order dated December 16, 1993. The Final Order was appealed by the opponents to the Chancery Court of Hinds County.

¶3. Chancellor Patricia Wise reviewed the appellate record and concluded that she was uncertain about the Department's determination on two questions. Chancellor Wise was not sure whether the record adequately reflected the Department's determination that the project constituted a relocation rather than a new facility, and whether the proposed MMC north campus project was needed. Therefore, Chancellor Wise remanded the case to the Department for another hearing to determine: (1) "whether the project was a relocation or the establishment of a new entity; (2) once that determination is made, whether or not the project is needed, as need is determined pursuant to the applicable service specific requirements of the State Health Plan and/or the relevant General Review Considerations of the Certificate of Need Manual."

¶4. Upon remand to the Department, the State Health Officer conducted a second public hearing on the matter, following which he granted MMC's CON application once again. Aggrieved by the second ruling as well, opponents appealed again to the Hinds County Chancery Court presided over by Chancellor Wise. Chancellor Wise again reviewed the record and the second findings of the Department. Chancellor Wise concluded that the granting of the CON was not an abuse of discretion, and she accordingly affirmed the decision via a thirty-two page Memorandum Opinion and Order.

¶5. Aggrieved by the chancellor's affirmance, opponents perfected their appeal and request review of the following issues:

> I. CAN A PROPOSED NEW HOSPITAL BE DESIGNATED A RELOCATION WHEN NOTHING OF SUBSTANCE, i.e., NO BEDS, NO SERVICES, NO EQUIPMENT AND NO STAFF IS BEING RELOCATED?
>
> II. CAN THE DESIGNATION OF A PROJECT AS A "RELOCATION" ELIMINATE THE STATUTORY REQUIREMENT OF PROOF OF NEED FOR THE PROJECT?
>
> III. IS THERE SUBSTANTIAL OBJECTIVE EVIDENCE IN THE RECORD OF NEED FOR A NEW HOSPITAL IN JACKSON?

¶6. This Court finds the points of error to be closely related and we will accordingly address them collectively.

¶7. Concerned with the overbuilding of hospitals caused by the federal Hill-Burton Act, Congress in 1974 passed the National Health Care Planning Resource Development Act. The Act required the states to adopt Certificate of Need statutes in order to prevent the unnecessary duplication of health care facilities. Under the CON laws, a new hospital or major capital expenditure cannot commence without filing an application and proving need.

¶8. In Mississippi, the Department is charged with reviewing applications for Certificates of Need, in accordance with the health care policies and priorities of this State. In an effort to have uniformity in its

decisions, the legislature promulgated by statute that these policies be set forth annually in the State Health Plan. Miss. Code Ann. § 41-7-173(s) (Supp. 1998). The 1992 State Health Plan at page I-1-2 lists the following general certificate of need policies:

> **General Certificate of Need Policies**: The general purposes of health planning in Mississippi are to: (1)Improve the health of Mississippi residents; (2)Increase the accessability, acceptability, continuity, and quality of health services; (3)Prevent unnecessary duplication of health resources; and (4)Provide some cost containment.

In the present case, the opponents appeal the decision of the Department, through the ruling of the Health Officer, approving the CON application of MMC for the 64 bed North Campus project. The Health Officer found the project to constitute a "relocation" rather than the building of a new hospital, and he accordingly applied a much less stringent standard for determining whether the project was needed. Based on this lessened standard, the Health Officer determined that the relocation was "advantageous," and he accordingly granted the CON.

¶9. It must first be acknowledged that this Court's standard of review in the present case is quite limited. As stated in *Mississippi State Department of Health v. Southwest Mississippi Regional Medical Center*, 580 So. 2d 1238, 1239 (Miss. 1991):

> This is a proceeding for judicial review of administrative action, and it is important that we understand and accept what this fact implies. The Legislature has directed that an S[tate] H[earing] O[fficer]'s CON order be subject to judicial review, but that it ...

> shall not be vacated or set aside, either in whole or in part, except for errors of law, unless the Court finds that the order ... is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the ... Department ..., or violates any vested constitutional rights of any part involved in the appeal. Miss. Code Ann. § 41-7-201(4) (Supp.1990).

> This is nothing more than a statutory restatement of familiar limitations upon the scope of judicial review of administrative agency decisions. *Magnolia Hospital v. Mississippi State Department of Health*, 559 So.2d 1042, 1044 (Miss.1990).

See also *Mississippi State Dep't of Health v. Mississippi Baptist Med. Ctr.*, 663 So. 2d 563, 573 (Miss. 1995). The decision of the hearing officer and State Health Officer is afforded great deference upon judicial review by this Court, even though we review the decision of the chancellor. *Mississippi State Dep't of Health v. Southwest Mississippi Reg'l Med. Ctr.*, 580 So. 2d 1238, 1240 (Miss. 1991).

¶10. In the present case, the Chancellor initially found the ruling of the Health Officer in approving the North Campus project to be arbitrary and capricious. The Chancellor was particularly skeptical of language in the Health Officer's original ruling expressing the view that, in proposing the North Campus project, MMC was primarily interested in entering the lucrative northeast Jackson market. The Chancellor wrote that:

> The Court finds that the Methodist Medical Center Application was not reviewed in accordance with the statutory requirement that there be substantial compliance with the projection of need contained in the State Health Plan in the following comment by the State Health Officer: "We are accepting the

argument of the opponents to this Application that MMC is primarily interested in increasing its market share and getting into a market of affluent population in the Northeast Jackson/South Madison County area." The Court finds this statement is antithetical to a conclusion that there is true need for this project. A primary purpose of increasing market share does not rise to the level of substantial evidence of need.

The Court notes the State Health Officer's conclusion that by imposing certain conditions with respect to the provision of care to certain underprivileged groups, that he believed would guarantee compliance with one of the goals of the State Health Plan, namely improvement of health care for the indigent and uninsured. The Court finds, however, that compliance with one of the goals of the State Health Plan does not relieve the Department of Health or the State Health Officer from its duty under the statute to review the project for need pursuant to any applicable service specific requirements of the State Health Plan and the relevant general considerations of the Certificate of Need Review Manual.

The Chancellor concluded that:

With these principles in mind, the Court concludes, in accordance with the arguments advanced in the briefs of the opponents as well as their oral arguments that the decision of the State Health Officer is arbitrary and capricious. The Court specifically finds the proper statutory review procedure was not follow(ed) by the Department in the present case.

The Chancellor accordingly reversed the Health Officer's first ruling and remanded for additional hearings and findings of fact and law. On remand, the Health Officer heard testimony from two additional witnesses and submitted a written ruling approving the North Campus project once again. The opponents once again appealed. The Chancellor's ruling affirming the Department's second ruling concludes that:

When this case first came to this Court, the conclusions of the State Health Officer were too tainted to pass muster. After all, judicial deference has some limits. The case was remanded for another hearing. The Court has again read the record in the case, which now includes a record of the proceedings in the remand hearing. The question whether on the evidence we would have arrived at the same conclusion is not at issue. Rather, the cardinal question is: does the conclusion of the State Health Officer issued on August 12, 1994 have a `warrant in the record' and a `reasonable basis in law' ? The answer is yes.

This Court agrees with the Chancellor that the Health Officer's initial ruling was arbitrary and capricious but, unlike the Chancellor, we find no basis for reaching a differing conclusion with regard to the second ruling. In the view of this Court, the Health Officer's second ruling, from which the present appeal is taken, contains serious errors which render the opinion erroneous as a matter of law.

¶11. In his second ruling, the Health Officer concluded that the proposed North Campus project constituted a "relocation" rather than the building of a new facility, and he applied a much less stringent standard of review based on this distinction. The Health Officer ruled that the project constituted a relocation mainly because of the fact that MMC, like many other area hospitals, is licensed to utilize more beds than it actually puts into operation. Specifically, MMC had a licensed capacity of 474 beds at the time of the CON application, but, due to lack of demand, only operated 280 beds. MMC thus proposed to "relocate" 64 of the 196 beds which it was licensed to utilize but did not have in actual operation. In his

ruling, the Health Officer defined the term "relocation" as "the moving of authority to provide a service from one location to another," thus granting MMC's proposal the status of a relocation in spite of the fact that there was no corresponding reduction of services at MMC's main south Jackson campus.

¶12. The term "relocation" is not defined in the Health Plan nor in statute, and the Health Officer was within his authority in making his own interpretation of this term. This Court should not disturb this interpretation of the term absent a finding that this interpretation is arbitrary and capricious. This Court has held that the Department has the authority to define terms in a manner inconsistent with their generally accepted definition. ***Mississippi State Dep't of Health v. Golden Triangle Reg'l Med. Ctr.,*** 603 So. 2d 854, 857 (Miss. 1992).

¶13. This Court finds the Health Officer's interpretation of the term "relocation" to be highly suspect legally. The North Campus project does not constitute a "relocation" in any ordinary sense of the word. The record is clear that a completely new building was constructed in northeast Jackson, and this building has been staffed with new medical workers and new equipment. There was no corresponding decrease in services at the main hospital in south Jackson, and, although the North Campus facility lacks an emergency room, the facility is, for all practical purposes, a new hospital.

¶14. While this Court finds the Health Officer's definition of "relocation" to be suspect, we consider it unnecessary to determine whether this definition is arbitrary and capricious. This Court concludes that the most serious error committed by the Health Officer, and the error requiring reversal, was not in defining "relocation," but rather in electing to apply a severely lessened standard of need to the North Campus project based upon a conclusion that a relocation was taking place. Regardless of the interpretation of the term "relocation," there is nothing in statute or case law which indicates that a lessened standard of need applies to determine if a "relocation" should be approved. To the contrary, Miss. Code Ann. § 41-7-191 requires CON approval for "the relocation of a health care facility or portion thereof, or major medical equipment" as well as for capital expenditures of over one million dollars. Under the Health Officer's definition of "relocation," the North Campus project should have qualified on both grounds.

¶15. The Health Officer not only failed to apply a full scale CON review of the North Campus project; he also elected to promulgate a new standard applicable to relocations: the "any specific advantage" test. The Health Officer wrote in his ruling that:

> Since this is a relocation of already licensed bed authority within the same Hospital Service Area, the issue of need doesn't revolve around whether or not there is a need for additional beds in this Hospital Service Area, because the proposed relocation won't increase the number of licensed beds. The true issue is whether or not there is any specific advantage in having the beds at a North Campus, as opposed to leaving that authority where it is. The overwhelming weight of the substantial, credible evidence in the records and exhibits of both hearings indicates that there is such an advantage.

The MMC, like many other hospitals, has a large surplus in licensed bed capacity. Under the precedent set by the Health Officer, the MMC, or any other hospital with surplus bed capacity, would be able to build a new hospital wherever it desired under the guise of a "relocation," as long as there is "any specific advantage" to their doing so. It is difficult to conceive of a more permissive standard for the building of a major new facility such as the North Campus than the "any specific advantage" standard formulated by the Health Officer.

¶16. Apparently recognizing the lack of legal foundation for the "any specific advantage" standard, the MMC appears to assert that this language was not the standard which the Health Officer actually used in the present case:

> Opponents latch onto one phrase in the opinion - - `any specific advantage' - - and assert this as the `new subjective standard' utilized by the Department. Such myopic analysis of the State Health Officer's opinion is telling and constitutes a gross distortion of the opinion.

The "any specific advantage" standard is not, as the MMC would seem to suggest, merely surplus language in the Health Officer's ruling. This language is, to the contrary, the standard which the Health Officer expressly set forth and *applied* in his ruling approving the North Campus project. After setting forth the "any specific advantage" test in his ruling, the Health Officer immediately proceeded to apply the newly-created standard:

> The most persuasive information to indicate that there are advantages to relocating comes from the testimony of Dr. Robert Smith and Dr. Geraldine Chaney during the course of the second hearing. Dr. Smith and Dr. Chaney, both primary care physicians currently practicing in the area in question, and both with substantial experience practicing medicine in the population to be served by Methodist at its current location and at its proposed North Campus, were the only two physicians to testify for any party on any matter at the remand hearing. When asked if the project had the effect of increasing access to primary care and access for low income and minority populations, both physicians testified that the relocation would have a beneficial effect.

While there is no apparent basis in law for the application of the "any specific advantage" standard set forth by the Health Officer at all, this Court finds it particularly ironic that the most "persuasive" advantage mentioned by the Health Officer was the increase in services which the hospital would provide to the "low income and minority population." The record demonstrates the demographics of the northeast Jackson area in which the North Campus was built, and this Court finds it difficult to accept that increasing services to the "low income and minority population" was a significant motivating factor in the hospital's construction.

¶17. A more likely motivation for the building of the new hospital in the affluent northeast Jackson area was mentioned by the Health Officer in his first ruling:

> We are accepting the argument of the opponents to this Application that Methodist Medical Center is primarily interested in increasing its market share and getting into a market of affluent population in the northeast Jackson/south Madison County area.

This Court agrees with the Health Officer that the construction of the new hospital in northeast Jackson was motivated by a desire to expand into this affluent area of Jackson, but this conclusion does not lend itself to confidence in the Health Officer's finding that the primary "advantage" of the new hospital is the benefits which it will provide to indigent patients.

¶18. In addition to promulgating the erroneous "any specific advantage" standard, the Health Officer made other erroneous conclusions of law in his second ruling. The Health Officer wrote in this ruling that:

> Mississippi has recognized that cost containment is not one of its primary objectives in health planning. It is illogical to disapprove this application on the basis that it may not achieve the goal of cost containment, when it does go far in achieving the other stated goals within the State Health Plan.

In stating that "cost containment is not one of [the] primary objectives in health planning" in this State, the Health Officer is clearly in error. This Court specifically held in ***Mississippi State Department of Health and River Oaks Hospital, Inc. v. Mississippi Baptist Medical Center***, 663 So.2d 563, 575 (Miss. 1995) that "[c]ost containment has thus been recognized by this Court as a primary purpose supporting the CON laws." This Court reversed in ***River Oaks***, based in large part upon the negative effect which the proposed project in that case would have on cost containment. In the instant case, the Health Officer seriously misinterpreted the law in this area when he concluded that cost containment was not a primary objective in health care planning.

¶19. MMC argues that, in spite of any errors in the "any specific advantage" standard employed by the Health Officer, the fact remains that the Health Officer made detailed findings of need in a proper legal context. The language of the ruling indicates otherwise. Prior to selectively addressing 8 of the 20 CON general considerations, the Health Officer made it clear that his analysis of these factors was in the context of a relocation rather than the building of a new hospital. The Health Officer stated in his ruling that:

> The second issue which the Court directed further exploration of was the issue of whether or not there is a need for the proposed relocation. The criteria under which the need for this project must be evaluated are different for the relocation of existing capacity than it would be for the establishment of new hospital beds.

After making the above qualification, the Health Officer went on to discuss 8 of the 20 CON factors. However, after discussing these factors, the Health Officer emphasizes once again in his ruling that:

> Since this is a relocation of already licensed bed authority within the same Hospital Service Area, the issue of need doesn't revolve around whether or not there is a need for additional beds in the Hospital Service Area, because the proposed relocation won't increase the number of licensed beds.

It is thus apparent that the Health Officer's selective discussion of *some* of the CON factors was, like the rest of his ruling, tainted by his erroneous conclusion that the "issue of need does not revolve around whether or not there is a need for additional beds in the Hospital Service Area." This conclusion by the Health Officer is the central error of the present appeal, and this Court would be doing a disservice to the citizens of this State by ignoring this error based on notions of deference to administrative agencies.

¶20. An analysis of the Health Officer's findings with regard to the 8 factors which he chose to address casts further doubt on his decision to approve MMC's application. In the view of this Court, many of the Health Officer's findings are very vague and of questionable validity. For example, the Health Officer found that:

> GRC 2 - <u>Long Range Plan</u>. The North Campus is certainly a part of Methodist Medical Center's long range plan. It is a natural extension of MMC's tradition of serving underserved populations such as indigents and minorities.

> GRC 6 - <u>Accessibility</u>. The staff's analysis and the testimony indicates that the relocation of these 64 beds will increase equal access to health services of members of traditionally medically underserved groups.

> GRC 19 - <u>Quality of Care</u>. Methodist's provision of quality care is undisputed. Its record of providing

that care to underserved populations is better, according to the testimony, than its competitors. Clearly GRG 19 is met.

This Court has previously noted our skepticism regarding the North Campus project's alleged primary advantage of benefitting indigents and minorities.

¶21. Other conclusions by the Health Officer are of questionable validity as well. The Health Officer found that:

> GRC 3 - The Availability of Less Costly/More Effective Alternatives. Hospital care is costly to deliver, however, Methodist's proposal is a less-costly method of delivering hospital care. Testimony in the record indicates that money would be saved at the North Campus because of the physical layout, job sharing among staff members, and because of the type patients the facility will serve. For this reason, the cost of delivering the same service at Methodist's existing facility or at other facilities is greater. There is no existing less costly, more effective way to deliver the service at present.

The record indicates that the North Campus project cost close to 30 million dollars and that daily patient charges at MMC would increase by more than 200 dollars as a result of the project. This Court finds the Health Officer's finding that there were no less costly alternatives to the North Campus project to be suspect.

¶22. The Health Officer also concluded that:

> GRC 7 - Relation to Existing Health Care System. The testimony in the record indicates that the proposed relocation will complement the existing health care system, not detract from it. As an example, the proposed facility's nearest neighbor, St. Dominic, doesn't provide obstetrical services. A significant portion of the proposed facility will be devoted to obstetrics. Additionally, the proposed facility constitutes an "access point" for primary care services not generally provided by the tertiary care hospitals in the area. Although these are two examples, there are other in the record.

This Court considers these findings to be, at best, incomplete. The Health Officer's ruling fails to mention that testimony clearly established that the Jackson area was overbedded even prior to the North Campus project. There was testimony that, far from "complementing" the existing health care providers, the MMC would threaten the financial well-being of other Jackson hospitals. The opponents note that hospitals seldom go out of business, and that a hospital's costs are, inevitably, passed on to patients. The Health Officer's failure to even mention the overbedding of the Jackson area raises serious doubts about the comprehensiveness of the ruling, particularly as it relates to factors militating against the approval of the proposal.

¶23. The Health Officer also found that the North Campus project was financially viable from the perspective of MMC:

> GRC 4 - Economic Viability of the Project. Although Methodist projects a first year loss of $600,000.00, it projects a gain of $1,400,000.00 the first year and $3,500,000.00 the second year, indicating economic viability. In addition, a feasibility study conducted by Methodist substantiates the economic viability of the project.

> GRC 8 - Availability of Resources. Methodist has demonstrated that adequate resources to provide

the proposed services are available. Indeed, there was testimony that the relocated service would enhance the ability to recruit primary care providers to the area. Clearly GRC 8 is met.

This Court does not doubt that the North Campus project, located in an affluent part of Jackson, is viable from the point of view of the MMC.

¶24. In the view of this Court, the most important factor in the present context is whether or not the North Campus project is actually needed. In this regard, the Health Officer found that:

> GRC 5 - <u>Need for the Project</u>. This review criterion relates to the need that the population served or to be served has for the services proposed to be offered or expanded and the extent to which all residents of the area, and in particular low income persons, racial and ethnic minorities, women, handicapped persons, and other underserved groups and the elderly, are likely to have access to those services.

> Methodist has demonstrated that the needs of all area residents, including low income, racial and ethnic minorities, women, handicapped persons and other underserved groups and the elderly are met by this project. The facility will provide low acuity care such as gynecological surgery, general surgery and primary care. Physician testimony indicated that the facility will likely increase access to care for low income and minority patients.

In the view of this Court, the nominal finding of "need" which the Health Officer did make in GRC 5 appears to be nothing more than a general assurance that the "needs" of all segments of the community will be met by the project, and this finding is expressly noted (twice) as having been made under a reduced standard of need supposedly applicable to "relocations." The ruling makes no mention of the testimony that Jackson was overbedded, nor does it mention the testimony that a new hospital providing similar obstetrical or surgical services was not needed and would likely have been rejected.

¶25. This Court's confidence in the Health Officer's assurance that the project is needed is further reduced by the fact that this finding of need was made on remand from the Chancellor with an explicit request that this determination be made. Given the Health Officer's conclusions regarding MMC's primary motivations expressed in his first ruling, his assurances on remand that the project is needed loses much of its persuasiveness. The most revealing aspect of the Health Officer's opinion as it relates to need, however, is his repeated statement that the issue of need does not revolve around the issue of whether additional services are needed by the Jackson community, given that a "relocation" is taking place. By expressly declining to make a finding that the new services provided by the project were needed, except under a highly permissive standard supposedly applicable to relocations, the ruling speaks volumes.

¶26. This Court concludes that the findings of law and fact in the Health Officer's ruling are either erroneous as a matter of law or tainted by their application under a lessened standard of review allegedly applicable to "relocations." This Court limits our conclusion that the Department acted arbitrarily and capriciously to the facts of the present case, however, and this opinion should not be interpreted otherwise. There may be other projects approved by the Department under a standard supposedly applicable to "relocations" which are distinguishable from the facts of the present case and/or which do not contain a sufficiently compelling basis in the record for reversal. This Court is mindful of the highly deferential standard of review which we must employ in appeals from rulings of the Department, but the record in the present case presents us with a sufficiently compelling basis for reversal that we cannot allow the Health Officer's ruling to stand.

¶27. While this Court would be justified in reversing based solely on the errors of law contained in the ruling, considerations of fairness dictate that we make an inquiry into the facts of the case ourselves, considered in their proper legal context. This Court deems it improper to remand for a third round of hearings before the Department unless there is substantial evidence of need for the North Campus project in the record. The starting point for our consideration of the North Campus project is our conclusion that the showing of need must be commensurate to what the project actually is and the impact which it actually has on the Jackson health care market. No lesser showing of need will be required by this Court based on the notion that a "relocation" has taken place. In considering the issue of whether the project is needed, it is also helpful to provide some legal and historical context for the consideration of this issue.

¶28. The opponents note that, for the most part, the CON laws stopped construction of unneeded hospitals. Since the passage of the CON statutes in 1979, only one new hospital had been built in this state, and no hospitals had even been proposed in Jackson until the North Campus project. This does not mean, however, that the problems caused during the era of hospital over-construction disappeared. According to the Department of Health's hospital bed need formula, Hinds County was over-bedded by 637 beds, and Hospital Service Area III, composed of 17 counties, was overbedded by 1,256 beds at the time of the review of the North Campus project.

¶29. MMC does not contest that the Jackson and Hospital Service Area III was and is overbedded, and this Court considers this factor to be a very significant one in determining whether a new hospital is needed. This Court also considers it significant that no new hospitals had even been proposed in Jackson in the period between the passage of the CON statutes and the proposal of the North Campus project. The opponents argue in their brief that "the Jackson hospital community was shocked when Methodist Medical Center, on November 17, 1992, filed an Application to construct a sixty-four bed hospital in affluent northeast Jackson."

¶30. This Court would harbor very serious reservations about the validity of the North Campus project and the factors which motivated it, based on the nature of the proposal and its legal and factual context alone. The issue arises as to why MMC felt it necessary to designate the project a "relocation" if the project were justifiable under the standards applicable to new hospitals. MMC argues that the Department had used a similar interpretation of "relocation" in the past, but the opponents submit that the Department had never classified a project on the scale of the North Campus project as a "relocation." At any rate, as noted earlier, the Department's most serious error was not in defining "relocation" but rather in applying a severely lessened standard of need to the project in the present case.

¶31. This Court is faced with evidence in the record that new hospitals were not needed and were not even being proposed in Jackson. In this context, we would question a proposal which sought to build what is, for all practical purposes, a new hospital in an affluent part of Jackson under the guise of a "relocation." This Court also harbors reservations about a project which purports to be concerned largely with benefitting indigent patients, but which is located in a part of Jackson where few indigent citizens actually live.

¶32. In addition to the factors discussed *supra,* this Court also has in the record the rulings and testimony of officials of the Department which strengthen our conclusion that the North Campus project was not approved because a new hospital was actually needed, but rather based on the notion that a "relocation" was taking place. Given his position an officer of the Mississippi Department of Health, and in light of his experience in dealing with CON issues, this Court considers the testimony of Harold Armstrong to be

particularly enlightening in this regard. Armstrong had testified in the hearings concerned with the ***River Oaks*** matter, which came before this Court in 1995. Harold Armstrong was asked about his testimony in that case in the case at bar:

> Q: As I appreciated your testimony in the River Oaks matter, it was your judgement that but for the fact that River Oaks agreed to offer 25 percent Medicaid care that - - other than that fact, you didn't believe there was need for additional obstetrical capacity in the Jackson area ? Is that a fair statement of what you said ?
>
> A: That's true.
>
> Q: Okay. So if that's the case, how is it that you see a need for additional obstetrical capacity to be located on Ridgewood Road near County Line Road as proposed in this application ?
>
> A: This is a relocation. It's not an expansion or addition to capacity.

When asked to reconcile his testimony regarding lack of need in ***River Oaks*** with his support of the North Campus project (which is largely concerned with providing obstetrical care), Armstrong did not cite any change in the need for obstetrical services in the Jackson area. Instead, Armstrong based his differing conclusion on the notion that a relocation was taking place.

¶33. Armstrong was even more direct when asked whether the Department would have approved a new hospital providing surgical services similar to that offered by the North Campus project:

> Q: Let me try to ask you this way, Mr. Armstrong. Let's just assume for a moment that an applicant comes along and wants to do, let's say 50 outpatient surgery beds. We don't have any regulations that are in the way of it. The only thing that applicant's got to show is that there is need for an additional - - let's make it a little more consistent with our application here. Let's say 30 outpatient surgical beds. No regulatory requirements in the way, except they've got to show need. Would there be need for an additional, let's say 30 outpatient surgery beds in the area proposed by Methodist, in your opinion ?
>
> A: Probably not.
>
> Q: Probably not ?
>
> A: Probably not.
>
> Q: Okay. That tells me, Mr. Armstrong, and you can correct me, that the real consideration here is that this is a relocation ?
>
> A: That's true.

Armstrong thus considered the fact that a relocation was taking place to be the "real consideration" which justified the approval of the North Campus project even though a "new" hospital project which proposed to add the very same services to the Jackson market would have been unneeded and "probably" rejected.

¶34. Armstrong's testimony was very clear with regard to the nature of the "relocation" in the present case:

> Q: Okay. All right. Now, right now, as we look at that CON application, as I appreciate it, there's

nothing in the CON application nor is there anything in your Staff Analysis to suggest that when they move these beds, and I'm using move in quotes here, when they move and relocate these beds to this North Campus out here that they're going to reduce their nursing staff and Methodist South to accommodate that move ? As a matter of fact, the CON says they're going to hire more nurses. Is that correct ?

A: Yes.

Q: Okay. Now there's nothing that suggests that the equipment that they're talking about utilizing in that circumstance up there is equipment that is going to be packed up in a box from down there and taken up to this circumstance; is that correct ?

A: Yes.

. . .

Q: And in answer to the question as to whether or not they were going to reduce any of their services or facilities at the other location, they said "We're not. All we're going to do is move these ethereal beds that we have on this license up there." Is that correct ?

A: That's right.

¶35. In the testimony of Harold Armstrong, and in the rulings of the Health Officer, this Court is presented with a consistent, and, it must be stated, commendably frank appraisal of the Department's rationale in approving the North Campus project. Both of these Department officials repeatedly state that their support for the project is based not upon any need for the new hospital or its services under standards applicable to new hospital proposals, but rather upon the fact that a relocation is supposedly taking place. This Court does not doubt the good faith of these Department officials, but we must conclude that their interpretation of the law in this area is arbitrary and capricious as applied to the facts of the present case.

¶36. It should be readily apparent that the Department's conclusion that new hospitals may be constructed under the guise of "relocations," even absent any need for the new hospitals, has the potential to cause serious damage to this State's health care system. Given the abundance of surplus licensed capacity possessed by hospitals throughout the State, this interpretation of the law has the potential to render the CON requirements a nullity. Implicit in the Department's rationale is the assumption that, merely because a hospital is licensed to provide a certain number of beds, it necessarily follows that there is a need for these beds. The fact remains, however, that the excess licensed capacity enjoyed by many hospitals has never had to withstand CON scrutiny, and any implied presumption of need in this regard is erroneous.

¶37. This paramount importance given by the Department to licensed bed capacity also serves to grant a monopoly of sorts on new hospital construction to those hospitals with excess licensed capacity. If the ruling of the Department were allowed to stand, then hospitals with excess capacity could expand, virtually at will, into affluent areas merely by "relocating" their unused licensed capacity to these areas. In the meantime, new providers who were not fortunate enough to have been over-licensed during an era of hospital over-construction would be shut out of this segment of the health care market. It is clear that the health care consumers would be the biggest losers in this situation: MMC's own proposal concedes a rise in its patients' daily costs by over 200 dollars per day as a direct result of the North Campus project.

¶38. There was, without doubt, testimony at the hearings as to benefits which would enure to the community from the construction of the new hospital. There was testimony, for example, that the facility would increase the number of primary care physicians in the area, that the addition of the facility would improve the quality of obstetrics care in northeast Jackson (including for medicaid patients), and that the presence of a hospital in northeast Jackson would increase the general quality of care in that area. This fact is hardly surprising and is, indeed, an inevitable result of the building of a new hospital by a quality provider such as MMC. A hospital provides valuable and necessary services to the residents in its area, and virtually any proposed hospital will have some "specific advantage" which supports its construction. The fact that a hospital will have some positive advantages by no means indicates, however, that its construction is necessary and beneficial in the scheme of the area health care network as a whole.

¶39. This Court's conclusion that the ruling of the Health Officer must be reversed is strengthened by the remarkably similar Alabama case of *Ex Parte Shelby Medical Center, Inc.*, 564 So. 2d 63 (Ala. 1990). In the *Shelby* case, Lloyd Nolan filed a CON application seeking to construct a $26,000,000 hospital in order to relocate licensed but unstaffed beds within an over bedded area. *Shelby*, 564 So. 2d at 69. Nolan contended that this was proper as the "facility [would have been] consistent with the [State Health Plan] because it involves relocating beds rather than adding beds to the area." *Id*.

¶40. The Alabama Supreme Court ultimately vacated the CON granted to Nolan because it held that the record did not contain sufficient evidence. *Shelby,* 564 So. 2d at 71. There was insufficient evidence because: 1) the project would have been "duplicative," and contrary to the cost containment goal of CON criteria; 2) evidence was present that "less costly, more efficient, and appropriate alternatives" were available; 3) "existing inpatient facilities with services similar to those proposed are not being used in an appropriate and efficient manner consistent with community demands"; 4) "alternatives to new construction have not been considered or implemented to the maximum extent practicable"; 5) "patients will not experience serious problems in obtaining inpatient care of the type proposed in the absence of the proposed new service . . . . the services offered would duplicate those offered by existing facilities in the area." *Shelby,* 564 So. 2d at 69-70.

¶41. The similarities between *Shelby* and the present case are obvious and compelling. These factual similarities are offered by the opponents as being precisely supportive of their position: 1) both have "some cost containment" as a CON criteria; 2) both projects are expected to cost $26,000,000; 3) a relocation of licensed unused beds is involved; 4) allegedly the services to be provided by MMC are duplicative as they were found to be in the *Shelby* case; and finally 5) the Alabama State Health Department and the MSDH approved the project because it was considered to not add new beds because it was a relocation of previously licensed beds.

¶42. This Court agrees with the opponents that, while not binding authority, the *Shelby* decision is very relevant persuasive authority in favor of their position. MMC argues that cost containment is a greater concern in Alabama than in this State, but, this Court noted in *River Oaks* that cost containment was a "primary" concern in Mississippi health care planning. This Court considers *Shelby* to be a well-reasoned decision and very helpful persuasive authority in this regard.

## CONCLUSION

¶43. This Court must reverse the ruling of the Health Officer and render judgment denying the CON application for the North Campus project. We are not unaware of the fact that MMC elected to build the

North Campus facility prior to receiving this Court's ruling on the validity of the project. It must be considered unwise for any litigant to take costly steps in anticipation of a favorable ruling by this Court. In the case of the appeal of a ruling which was reversed once by the Chancellor, and which only narrowly avoided reversal a second time, this action must be considered a risk assumed solely by MMC. The fact that a litigant has taken such costly steps in anticipation of a ruling by this Court should not, of course, affect the course of this Court's deliberations. To do otherwise would be to abdicate our role as highest court of this State. It is our hope that MMC's motivation in building the North Campus project prior to our decision was not to present this Court with a *fait accompli* which we would be unwilling to disturb.

¶44. It is the view of this Court that the North Campus project was not supported by substantial evidence of need, and it is at this point that our inquiry must cease. We must reverse the ruling of the Health Officer and render judgment denying CON approval for the North Campus project. This Court does determine, however, that this matter should be remanded to the Chancellor for an enforcement of the ruling. This Court's ruling does not dictate that operations at the North Campus facility cease immediately. Instead, we direct that the Chancellor be given full discretion to enforce this Court's ruling in a manner consistent with the best interests of MMC's patients and the citizens of Jackson.

¶45. **REVERSED, RENDERED AND REMANDED.**

**SULLIVAN AND PITTMAN, P.JJ., McRAE AND SMITH, JJ., CONCUR. ROBERTS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, J. MILLS AND WALLER, JJ., NOT PARTICIPATING.**

**ROBERTS, JUSTICE, DISSENTING:**

¶46. Because this case is affirmable, I respectfully dissent from the majority.

## SUMMARY

¶47. This case involves the appeal of a Certificate Of Need (CON) application granted to Methodist Medical Center by the Mississippi State Department of Health (MSDH). The appellants contend that the MSDH, the hearing officer, and the chancellor have improperly allowed a CON application because an undefined term, relocation, has been incorrectly defined and because the requisite need for such an application has allegedly not been demonstrated. This Court should find that the defining of a health care term which was not defined by the legislature is left to the discretion of the MSDH. ***Mississippi State Dep't of Health v. Golden Triangle Reg'l Med. Ctr.,*** 603 So. 2d 854, 857 (Miss. 1992). Additionally, this Court should find that the record is replete with conflicting evidence in support of either side, and that it was the hearing officer's role and function to determine which evidence to give what amount of weight in arriving at his decision. ***Ohio Oil Co. v. L.B. Porter,*** 225 Miss. 55, 60, 82 So. 2d 636, 638 (1955).

Therefore, this Court should hold that the hearing officer's and the chancellor's decision is supported by substantial evidence. Furthermore, in light of the deference afforded the agency's decision, the instant case should be affirmed.

## STATEMENT OF THE CASE

¶48. The procedural history of this case began November 17, 1992 when Methodist Medical Center (hereinafter MMC) filed a Certificate of Need Application (CON) with the Mississippi State Department of Health (hereinafter MSDH) to establish what it called a Primary Care Center (PCC) in north Jackson on Ridgewood road. MMC's CON application encountered a public hearing request by St. Dominic-Jackson Memorial hospital (hereinafter St. Dominic), Mississippi Baptist Medical Center (hereinafter MBMC), and Woman's Hospital,[2] all of which opposed MMC's application. [3]

¶49. During the first CON hearing, the MSDH conducted a three phase review analyzing MMC's application and decided that the CON should be granted. The Staff of the Health Planning Division of the MSDH subsequently issued a seventeen page report recommending approval. Thereafter, the MSDH had a hearing on MMC's CON application which lasted eight days. At the conclusion of this hearing, the hearing officer endorsed the proposal and recommended that the CON application be granted subject to four conditions. State Health Officer, Dr. F. E. Thompson, then reviewed the entire record and concurred in the Staff's and hearing officer's recommendation by approving MMC's application by Final Order dated December 16, 1993. The Final Order was appealed by the opponents to the Chancery Court of Hinds County.

¶50. Chancellor Patricia Wise reviewed the appellate record and concluded that she was uncertain about the MSDH's determination on two questions. Chancellor Wise was not sure whether the record adequately reflected the MSDH's determination that the project constituted a relocation rather than a new facility, and whether the proposed MMC north campus project was needed. Therefore, Chancellor Wise remanded the case to the MSDH for a another hearing to determine: (1) "whether the project was a relocation or the establishment of a new entity; (2) once that determination is made, whether or not the project is needed as need is determined pursuant to the applicable service specific requirements of the State Health Plan and/or the relevant General Review Considerations of the Certificate of Need Manual."

¶51. Upon remand to the MSDH, the State Health Officer conducted a second public hearing on the matter which lasted two days. The State Health Officer eventually concluded that (1) the project does constitute a relocation under the meaning of the State Health Plan and (2) that the project was needed. Therefore, the State Health Officer granted MMC's CON.

¶52. Aggrieved by the second ruling as well, opponents appealed again to the Hinds County Chancery Court presided over by Chancellor Wise. Chancellor Wise again reviewed the record and the second findings of the MSDH. Chancellor Wise concluded that MMC had met its burden, and that the CON was properly granted. Accordingly, Chancellor Wise affirmed the decision via a thirty-two page Memorandum Opinion and Order.

¶53. Aggrieved by the chancellor's affirmance, opponents perfected their appeal and request review of the following issues:

## I. CAN A PROPOSED NEW HOSPITAL BE DESIGNATED A RELOCATION WHEN

**NOTHING OF SUBSTANCE, i.e., NO BEDS, NO SERVICES, NO EQUIPMENT AND NO STAFF IS BEING RELOCATED?**

**II. CAN THE DESIGNATION OF A PROJECT AS A "RELOCATION" ELIMINATE THE STATUTORY REQUIREMENT OF PROOF OF NEED FOR THE PROJECT?**

**III. IS THERE SUBSTANTIAL OBJECTIVE EVIDENCE IN THE RECORD OF NEED FOR A NEW HOSPITAL IN JACKSON?**

¶54. In response to opponent's statement of the issues, MMC frames the issues as follows.

**I. DID THE CHANCELLOR APPROPRIATELY APPLY THE PROPER RESTRICTED STANDARD OF JUDICIAL REVIEW APPLICABLE TO ADMINISTRATIVE LAW CASES IN HER AFFIRMATION OF THE DEPARTMENT'S DECISION?**

**II. IS THE STATE HEALTH OFFICER'S FINDING OF NEED, AND THE CHANCELLOR'S AFFIRMANCE THEREOF, SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD?**

**III. IS THE STATE HEALTH OFFICER'S DETERMINATION THAT THE MMC PROJECT IS A RELOCATION PROJECT IN ACCORDANCE WITH THE DEPARTMENT'S ESTABLISHED POLICIES, PRACTICES, AND ACCEPTED DEFINITIONS, AND THAT DETERMINATION'S AFFIRMANCE BY THE CHANCELLOR BELOW, NEITHER ARBITRARY NOR CAPRICIOUS, REQUIRING AFFIRMANCE BY THIS COURT?**

**IV. WAS THE STATE HEALTH OFFICER'S REVIEW OF THE MMC PROJECT FOR CONSISTENCY WITH THE CRITERIA AND STANDARDS APPLICABLE TO A RELOCATION PROJECT, AND THE CHANCELLOR'S AFFIRMANCE BELOW, NEITHER ARBITRARY NOR CAPRICIOUS, REQUIRING AFFIRMANCE BY THIS COURT?**

Oral argument took place on July 22, 1996.

**STATEMENT OF THE FACTS**

¶55. The facts of this case are not particularly complex, although much is in direct conflict at times. The case involves much expert testimony regarding the medical industry's determination of what services are needed where and within which type of community. What is disputed is: (a) the application, definition and/or interpretation of the term "relocation" as it applies to certificate of need questions because it is not defined in writing by statute or by the MSDH under the State Health Plan and (b) whether the project's service area has the demographic need to warrant the project. Accordingly, this dispute raises arguments about who, where, and what should be considered in defining the term relocation.

¶56. The voluminous several thousand page record begins with MMC's CON application. The remainder of the record consists of, but not limited to, testimony from the initial eight day hearing from both sides' witnesses, included but not limited to demographic experts in support of both sides, MSDH officials, other witnesses, the chancellor's initial review and remand order, testimony from the two day remand hearing, and

finally the second subsequent appeal with the respective affirmance by the chancellor. Nevertheless, opponents contend that the State Health Officer's and the chancellor's decisions are not supported by substantial credible evidence, and are thus arbitrary and capricious requiring a reversal. I have found 1) that the record contains evidence supporting each side's argument, an inescapable result when competing interests have the wherewithal to employ "expert" testimony in their behalf; 2) that a central dispute revolves around a term, relocation, not defined by any source, but apparently "understood" until MMC's present CON application was filed; 3) that the chancellor applied the proper deference due to administrative agency's decisions; and finally, 4) that under the proper standard of review, that this case should be affirmed as it is supported by the record. The reason the term "relocation" had been apparently "understood" until now is because St. Dominic itself previously used the "relocation" method regarding a CON application. MMC attorney, Thomas Prewitt, obtained an admission from St. Dominic president Claude Harbarger that when St. Dominic previously acquired Doctor's Hospital, that licensed unused medical/surgical beds of Doctors Hospital were "relocated" to St. Dominic's original location. Prewitt also elicited testimony from Haro ld Armstrong who stated that St. Dominic relocated 98 unused, yet licensed beds from Doctors Hospital to its present location when St. Dominic was operating at a 65% occupancy rate. Armstrong also testified that this was what was generally considered by the MSDH to be a relocation and that it was the MSDH's general policy to allow this type of relocation from one facility to another within the same service area.

¶57. In a nutshell, the following is what is involved in this case. MMC currently operates a medical hospital in south Jackson, Mississippi. In late 1992, MMC filed an application for CON with the MSDH to open a sixty four bed primary care center. Aggrieved and/or threatened, the opponents requested a hearing in an apparent attempt to defeat MMC's application. Evidence was presented to a hearing officer for eight days. MMC presented its experts and physicians, as well as testimony of Harold Armstrong, current Chief of the Division of Health Planning and Resource Development with the MSDH and previous head of the Certificate of Need Program, in support of its position that this was a proper relocation. However, the opponents naturally offered their experts and physicians for the proposition that Service Area 3 did not warrant MMC's proposed project, and that this was not a relocation as this was in reality the establishment of a new hospital.

¶58. The dispute over whether or not this is a relocation arises because Service Area 3 is currently over bedded. The opponents therefore contend that MMC intends to add beds to the already over bedded area. However, MMC contends that what it is wanting to do is not add additional new beds to the service area, but rather to relocate previously licensed beds from its south Jackson facility to its new proposed north Jackson facility. Therefore, MMC asserts that the market will not see an increase in bed capacity for Service Area 3. It appears that this was not a disputed issue until now.

¶59. It is true that MMC has already obtained a license, approximately twelve years ago, for the beds it seeks to relocate and operate in the north Jackson facility. It is also true that MMC does not physically use these beds in its south Jackson facility at this time. Therefore, the opponents contend that these are "phantom beds" as they are not currently used, have never been staffed, and will not actually be physically relocated anywhere. However, the opponents own expert, Richard Johnson, testified that MMC has actually operated these sixty four beds at one time or another in the past.

¶60. To apply the hearing officer's, the MSDH's and the chancellor's definition of relocation is to allegedly be inconsistent with the "ordinary sense of the word." However, the Court has previously rejected the

argument that the MSDH is constrained in defining a term in a manner only consistent with its "ordinary sense."*Mississippi State Dep't of Health v. Golden Triangle Reg'l Med. Ctr.,* 603 So. 2d 854, 857 (Miss. 1992)(MSDH afforded deference in defining undefined terms of the State Health Plan).

¶61. Harold Armstrong and the hearing officer claim that it is a relocation because the term means "the moving of <u>authority</u> to provide a service from one location to another." (emphasis added). However, opponents point out that Armstrong testified that if a new provider sought to obtain a CON for sixty four "new" beds that it would probably be denied. Therefore, as the sixty four beds which will be used in the north MMC location are not presently in use, the opponents assert that these beds are actually new beds, which had MMC not already obtained a license, their implementation would be denied. This is why the opponents contend that MMC used the "relocation avenue" for implementing these beds when they otherwise would not have been able to obtain permission for them purportedly illustrating the "legal fiction" of MMC's and the MSDH's argument. This in turn raises the question of the meaning and definition of relocation. This Court has found that the MSDH is the best source for a definition, acting by and through the State Health Officer. See *Mississippi State Dep't of Health v. Golden Triangle Reg'l Med. Ctr.,* 603 So. 2d 854, 857 (Miss. 1992)(MSDH afforded deference in defining undefined terms of the State Health Plan).

¶62. In accordance with his duty prescribed by Miss. Code Ann. Section 41-7-197(2), the hearing officer held the requested hearing. He applied the criteria and goals/needs set forth in the 1992 Mississippi State Health Plan which was developed by the MSDH as required by Miss. Code Ann. § 41-7-173(s) for a relocation pursuant to §41-7-191(1)(b). The hearing officer found that this is a relocation because the MSDH defines the term to mean "the moving of <u>authority</u> to provide a service from one location to another."

¶63. Furthermore, it is important to note that the Statement of Facts from MMC's brief are supported by testimony in the record. The State Health Officer's comments upon issuing his recommendation for approval of MMC's application upon remand are supported by the record and the MSDH Staff Analysis report. Also, Chancellor Wise's Memorandum Order and Opinion issued in response to the second appeal perfected by the opponents following remand is supported by testimony in the record. Lastly, I have examined the Mississippi State Health Plan and finds it supportive of the MSDH's decision to grant the CON.

**DISCUSSION OF ISSUES**

**I. CAN A PROPOSED NEW HOSPITAL BE DESIGNATED A RELOCATION WHEN NOTHING OF SUBSTANCE, i.e., NO BEDS, NO SERVICES, NO EQUIPMENT AND NO STAFF IS BEING RELOCATED?**

**II. CAN THE DESIGNATION OF A PROJECT AS A "RELOCATION" ELIMINATE THE STATUTORY REQUIREMENT OF PROOF OF NEED FOR THE PROJECT?**

**III. IS THERE SUBSTANTIAL OBJECTIVE EVIDENCE IN THE RECORD OF NEED FOR A NEW HOSPITAL IN JACKSON?**

¶64. In response to opponent's statement of the issues, MMC frames the issues as follows.

**I. DID THE CHANCELLOR APPROPRIATELY APPLY THE PROPER RESTRICTED STANDARD OF JUDICIAL REVIEW APPLICABLE TO ADMINISTRATIVE LAW CASES IN HER AFFIRMATION OF THE DEPARTMENT'S DECISION?**

**II. IS THE STATE HEALTH OFFICER'S FINDING OF NEED, AND THE CHANCELLOR'S AFFIRMANCE THEREOF, SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD?**

**III. IS THE STATE HEALTH OFFICER'S DETERMINATION THAT THE MMC PROJECT IS A RELOCATION PROJECT IN ACCORDANCE WITH THE DEPARTMENT'S ESTABLISHED POLICIES, PRACTICES, AND ACCEPTED DEFINITIONS, AND THAT DETERMINATION'S AFFIRMANCE BY THE CHANCELLOR BELOW, NEITHER ARBITRARY NOR CAPRICIOUS, REQUIRING AFFIRMANCE BY THIS COURT?**

**IV. WAS THE STATE HEALTH OFFICER'S REVIEW OF THE MMC PROJECT FOR CONSISTENCY WITH THE CRITERIA AND STANDARDS APPLICABLE TO A RELOCATION PROJECT, AND THE CHANCELLOR'S AFFIRMANCE BELOW, NEITHER ARBITRARY NOR CAPRICIOUS, REQUIRING AFFIRMANCE BY THIS COURT?**

¶65. These issues are variations on the same questions and shall be addressed collectively.

¶66. This case is a conflict over market share and territory, where both parties have been able to produce expert testimony conflicting each other. Accordingly, it was the hearing officer's duty to determine the credibility of the witnesses and rule appropriately. As pointed out by MMC, "[i]t is not for this Court to substitute its opinion for the opinion of the Board [MSDH] where the Board [MSDH] has reached its decision on conflicting evidence and where its conclusions are supported by substantial evidence." *Ohio Oil Co. v. L.B. Porter,* 225 Miss. 55, 60, 82 So. 2d 636, 638 (Miss. 1955).

¶67. This Court, as did the Hinds County Chancellor, must review this agency decision under a restrictive standard of judicial review. As stated in *Mississippi State Department of Health v. Southwest Mississippi Regional Medical Center*, 580 So. 2d 1238, 1239-40 (Miss. 1991), the following is applicable:

> This is a proceeding for judicial review of administrative action, and it is important that we understand and accept what this fact implies. The Legislature has directed that an S[tate] H[earing] O[fficer]'s CON order be subject to judicial review, but that it

> ... shall not be vacated or set aside, either in whole or in part, except for errors of law, unless the Court finds that the order ... is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the ... Department ..., or violates any vested constitutional rights of any part involved in the appeal.

> Miss. Code Ann. § 41-7-201(4) (Supp.1990). This is nothing more than a statutory restatement of familiar limitations upon the scope of judicial review of administrative agency decisions. *Magnolia Hospital v. Mississippi State Department of Health*, 559 So.2d 1042, 1044 (Miss.1990); *Melody Manor Convalescent Center v. Mississippi State Department of Health*, 546 So.2d

972, 974 (Miss.1989); ***Grant Center Hospital of Mississippi, Inc. v. Health Group of Jackson, Mississippi, Inc.,*** 528 So.2d at 808 (courts may alter the administrator's action only if convinced it is arbitrary, capricious or unreasonable, or is not supported by substantial evidence).

See also ***Mississippi State Dep't of Health v. Mississippi Baptist Med. Ctr.***, 663 So. 2d 563, 573 (Miss. 1995).

¶68. Accordingly, the decision of the hearing officer and State Health Officer is afforded great deference upon judicial review by this Court even though we review the decision of the chancellor, who applies a standard of review of great deference, de novo. ***Mississippi State Dep't of Health v. Southwest Mississippi Reg'l Med. Ctr.***, 580 So. 2d 1238, 1240 (Miss. 1991). The following is an analysis applying the proper standards of review which would support an affirmance.

¶69. The legislature intended that the health policies for the State of Mississippi be determined by the Mississippi State Department of Health as it is in the best position to make such decisions. In an effort to have uniformity in its decisions, the legislature promulgated by statute that these policies be set forth annually in the State Health Plan which shall be the *sole and official* statewide health plan for the state. Miss. Code Ann. § 41-7-173(s)(Supp. 1998) (emphasis added). Additionally, when enacting Title 41 chapter 7 of the Mississippi Code, the legislature specifically defined numerous terms. Miss. Code Ann. Definitions. § 41-7-173. However, in so doing, the term "relocation," as it applies to the health care industry, was not defined. Therefore, as the administrative agency is charged with the responsibility of managing Mississippi's health care practices, "identif[ying] priority state health needs," and "establish[ing] standards and criteria for health related activities which require certificate of need review in compliance with Section 41-7-191," it would appear that the duty of defining "relocation" was left to the MSDH. Miss. Code Ann. § 41-7-173(s) (Supp. 1998). See ***Mississippi State Dep't of Health v. Golden Triangle Reg'l Med. Ctr.,*** 603 So. 2d 854, 857 (Miss. 1992)(MSDH afforded deference in defining undefined terms of the State Health Plan).

¶70. The term relocation appears in Miss. Code Ann. Section 41-7-191(1)(b). This provision of the statute refers to either the relocation of an entire health care facility or a portion thereof. Miss. Code Ann.§ 41-7-191(1)(b) (Supp. 1998). Consequently, the term was used in a manner by the legislature inconsistent with the definition offered by the opponents. The opponents' expert contends that relocation means "take and redesign a hospital on a new site. . . . . Close down the old facility and then operate the new one on a separate location, that's a relocation." However, opponents' expert did concede that the past practices of the MSDH regarding relocation had been applied in the same manner by the MSDH as it was being applied in this case. He simply disagreed with the policy.

¶71. The hearing officer determined that the particular level of authority ( are the items to be relocated licensed?) was what was critical in evaluating a relocation CON application. I believe that if the chancellor or the hearing officer had accepted the opponents' definition, it would have been contrary to the obvious language used by the legislature which referred to requests for relocation of a portion of a facility as well as the entire facility. It appears that the MSDH properly rejected the opponents' proposition for how the term relocation should be defined in terms of consistency.

¶72. A somewhat similar case is offered by MMC as controlling on how defining undefined terms in the health care field is to be handled. In ***Mississippi State Dep't of Health v. Golden Triangle Reg'l Med. Ctr.,*** 603 So. 2d 854 (Miss. 1992), the Court addressed the problem of how the undefined term of "population base" should be applied in a CON application. The chancellor reversed the MSDH's

interpretation by holding that an undefined term in the State Health Plan "must be given its generally accepted definition." ***Mississippi State Dep't of Health v. Golden Triangle Reg'l Med. Ctr.,*** 603 So. 2d at 856. Upon appeal, this Court reversed and rendered the chancellor's reversal finding that the MSDH's definition of population base, which was not its *generally accepted definition,* was nevertheless not arbitrary and capricious. ***Mississippi State Dep't of Health v. Golden Triangle Reg'l Med. Ctr.,*** 603 So. 2d at 857. Accordingly, the Court has previously held that the MSDH may properly define undefined terms, so long as such a definition is not arbitrary and capricious. Therefore, it would appear that the MSDH's definition and application of that respective definition to this case should not be disturbed as it does not appear arbitrary and capricious even though it may not comply with its *generally accepted definition.* [(4)]

¶73. The chancellor's ruling in this case appears thorough, consistent with the letter of the law, and most importantly supported by substantial evidence in the record. As the chancellor noted, although there was conflicting evidence in support of either side's argument regarding relocation and need, it was the MSDH's hearing officer's duty to evaluate and weigh credibility. His decision shall not be second guessed on appeal by those unable to measure the demeanor of the witnesses. ***Ohio Oil Co. v. Porter,*** 225 Miss. 55, 60, 82 So. 2d 636, 638 (1955).

¶74. Much argument throughout the parties' briefs centers around what criteria should be applied in evaluating a relocation CON application. The MSDH and MMC assert that based upon the 1992 State Health Plan, that the primary health need, an applicable factor to weigh in a CON review, to be fulfilled by health care providers is "health care for the indigent and uninsured." 1992 State Health Plan. The State Health Plan is the sole and official statewide health plan for Mississippi pursuant to § 41-7-173(s). Opponents claim that while this may be a need in Mississippi's health care system, that it is not one of the four listed criteria to be used in evaluating CON applications and to do otherwise is inappropriate. I disagree with the opponents' assertion.

¶75. The 1992 State Health Plan at page I-1-2 states:

> **General Certificate of Need Policies**: The general purposes of health planning in Mississippi are to: (1)Improve the health of Mississippi residents; (2)Increase the accessability, acceptability, continuity, and quality of health services; (3)Prevent unnecessary duplication of health resources; and (4)Provide *some* cost containment. (Emphasis added).

¶76. The list is followed by this very important next sentence. "It is the intent of the MSDH that an application for a CON be approved IF the applicant substantially complies with the projected need AND with applicable standards and criteria as contained in this Plan." (Emphasis added). The Plan continues with the following language. "Furthermore, it is the intent of the MSDH that CON applications be disapproved if the applicant: 1) fails to provide or confirm that he shall provide a reasonable amount of indigent care, or 2) has admissions policies which deny access to care by indigent patients. Also, it is the intent of the MSDH that a CON application be disapproved if approval of the request would have a significant adverse effect on the ability of an existing facility or service to provide indigent care." 1992 Mississippi State Health Plan.

¶77. Accordingly, opponents' interpretation of the State Health plan when read as a whole fails to consider the express intent of the MSDH under the Plan. As noted in the first sentence following the list of general CON criteria, the MSDH expressly states in the conjunctive that a CON will be granted IF the application complies with the projected NEED AND with the four general criteria. The intent of the MSDH expressly

encompasses indigent care and access thereto. State Health Plan at I-2. Admittedly, this reference refers to a factor outside of the four specifically listed general CON policies because it refers to the health needs of the state as determined through public meetings and comments to the MSDH. However, the opponents' construction is skewed, and accordingly this Court should reject the opponents' analysis in favor of the more sensible interpretation given by the hearing officer and the MSDH of the method of CON evaluation.

¶78. As for whether or not there was substantial evidence to support the hearing officer's, State Health Officer's and chancellor's decisions, this Court should find that there was. The MSDH has the authority to develop and establish criteria for granting CONs and to objectively review the information submitted in applications. See Miss. Code Ann. §§ 41-7-187, 41-7-189 (1993). In the case sub judice, a staff analysis was done on MMC's application. The staff analysis summarized the project, set out the type of review required and then evaluated the application pursuant to the State Health Plan and other adopted criteria, including, but not limited to: need, charity/indigent care, project cost per square foot, renovation/expansion versus replacement, long range development, less costly/more effective alternative, economic viability, accessibility, relationship to existing health care system, quality of care and financial feasibility. The analyses along with the staff conclusions and recommendations were then submitted to the hearing officer who passed his determination along to the State Health Officer. The State Health Officer, after reviewing all submitted information, including testimony from Harold Armstrong, Richard Holnson, Noel Falls, Robert Smith, Geraldine Bowie, Claude Harbarger and Joe Lusteck, set out his findings and conclusions and made the ultimate decision to approve MMC's CON application.

¶79. The State Health Officer, in his decision approving MMC's CON application, found:

GRC 2 - Long Range Plan. The North Campus is certainly a part of Methodist Medical Center's long range plan. It is a natural extension of MMC's tradition of serving underserved populations such as indigents and minorities.

GRC 3 - The Availability of Less Costly/More Effective Alternatives. Hospital care is costly to deliver, however, Methodist's proposal is a less-costly method of delivering hospital care. Testimony in the record indicates that money would be saved at the North Campus because of the physical layout, job sharing among staff members, and because of the type patients the facility will serve. For this reason, the cost of delivering the same service at Methodist's existing facility or at other are facilities is greater. There is no existing less costly, more effective way to deliver the service at present.

GRC 4 - Economic Viability of the Project. Although Methodist projects a first year loss of $600,000.00, it project a gain of $1,400,000.00 the first year and $3,500,000.00 the second year, indicating economic viability. In addition, a feasibility study conducted by Methodist substantiates the economic viability of the project.

GRC 5 - Need for the Project. This review criterion relates to the need that the population served or to be served has for the services proposed to be offered or expanded and the extent to which all residents of the area, and in particular low income persons, racial and ethnic minorities, women, handicapped persons, and other underserved groups and the elderly, are likely to have access to those services.

Methodist has demonstrated that the needs of all area residents, including low income, racial and ethnic minorities, women, handicapped persons and other underserved groups and the elderly are met

by this project. The facility will provide low acuity care such as gynecological surgery, general surgery and primary care. Physician testimony indicated that the facility will likely increase access to care for low income and minority patients.

GRC 6 - Accessibility. The staff's analysis and the testimony indicates that the relocation of these 64 beds will increase equal access to health services of members of traditionally medically underserved groups.

GRC 7 - Relation to Existing Health Care System. The testimony in the record indicates that the proposed relocation will complement the existing health care system, not detract from it. As an example, the proposed facility's nearest neighbor, St. Dominic, doesn't provide obstetrical services. A significant portion of the proposed facility will be devoted to obstetrics. Additionally, the proposed facility constitutes an "access point" for primary care services not generally provided by the tertiary care hospitals in the area. Although these are two examples, there are others in the record.

Clearly GRC 7 is met.

GRC 8 - Availability of Resources. Methodist has demonstrated that adequate resources to provide the proposed services are available. Indeed, there was testimony that the relocated service would enhance the ability to recruit primary care providers to the area. Clearly GRC 8 is met.

GRC 19 - Quality of Care. Methodist's provision of quality care is undisputed. Its record of providing that care to underserved populations is better, according to the testimony, than its competitors. Clearly GRC 19 is met.

¶80. It is evident that the State Health Official considered and weighed all the evidence before he made his final determination. Furthermore, the chancellor's memorandum opinion and order, which is thirty-two pages in length, is a comprehensive and complete determination based on all evidence reviewed. Not only did the chancellor review the staff analysis and the State Health Official's report, but she also reviewed and summarized all testimony before him in support of the State Health Official's determination and finally his affirmance.

¶81. Furthermore, it is important to note that because this is a relocation of already licensed bed authority within the same Hospital Service Area, the issue of need does not revolve around whether or not there is a need for additional beds in this Hospital Service Area, as the proposed relocation will not increase the number of licensed beds. The true issue is whether or not there is any specific advantage in having the beds at a North Campus, as opposed to leaving the authority where it is. The overwhelming weight of the substantial, credible evidence in the records, including the testimony of the witnesses and exhibits of the hearing, indicates that there is such an advantage. Therefore, this Court should affirm this case as this issue is without merit as well because there is substantial evidence in the record of need to support the issuance of the CON to MMC.

¶82. The opponents' argument receiving the majority of attention involves the allegedly nonevaluation of criteria #4 of 4, being the providing of *some* cost containment. 1992 State Health Plan. Opponents contend that in addition to the demographics not warranting this facility, that it is intentionally mislabeled as a primary care center because it is really a hospital. As such, opponents assert that the 26 million dollar capital expenditure will drive up costs to be borne by the public which is naturally in conflict with a CON review

criteria. According to the opponents, the MSDH should consider criteria #4 as paramount in it decision making.

¶83. Much testimony was offered discussing criteria #4, providing some cost containment. However, Armstrong unequivocally stated that some cost containment was not the number one priority in evaluating a CON application. Rather, he and Noel Falls explained that the number one goal and need to improve the health of Mississippi, CON criteria #1 of 1, was to "care for the medically indigent and uninsured." In fact, opponents' own expert, Johnson, was forced to admit that "at least ten years ago national studies started coming out which showed that CON laws are totally ineffective in meeting the goal of cost containment." In addition to this testimony, Johnson admitted that "cost containment is probably the least successful modality of CON programs."

¶84. I do recognize that in *Mississippi State Dep't of Health v. Mississippi Baptist Med. Ctr.*, 663 So.2d 563 (Miss. 1995), this Court noted that cost containment has been recognized as "**a primary purpose** supporting the CON laws." *Mississippi State Dep't of Health v. Mississippi Baptist Med. Ctr.*, 663 So. 2d 563, 575 (Miss. 1995) (emphasis added). However, it has never been stated by this Court that it is **the** primary purpose, and affirming the case sub judice does not conflict or violate *Mississippi Baptist Medical Center*. Although cost containment is a primary and important consideration when determining whether CON requirements have been met, it is not the only criteria allowing approval of a CON application. It is just one of the goals Mississippi strives to achieve in health planning. Furthermore, cost containment was a criteria dealt with by the hearing officer and State Health Official and was discussed in detail in the staff analysis. Accordingly, this CON criteria was met. These findings were not contradicted by the chancellor, who in fact also found that cost containment goals were met.

¶85. Therefore, this Court should decline to accept the opponents' assertion that cost containment is the foremost concern in evaluating CON applications and that the health needs as established by the MSDH should not be considered. To hold otherwise would be contrary to the clearly established intent of the MSDH as set out in the State Health Plan which is the *sole and official* source by statute for health care planning in Mississippi.[5] Furthermore, the criteria of cost containment was met and supported by substantial evidence provided by the State Health Official and the staff analysis.

¶86. Opponents have offered persuasive authority from Alabama throughout these proceedings as there was no controlling Mississippi authority. *See Ex Parte Shelby Med. Ctr., Inc.*, 564 So. 2d 63 (Ala. 1990). In the *Shelby* case, Lloyd Nolan filed a CON application seeking to construct a $26,000,000 hospital in order to relocate licensed unstaffed beds within an over bedded area. *Shelby*, 564 So. 2d at 69. Nolan contended that this was proper as the "facility [would have been] consistent with the [State Health Plan] because it involves relocating beds rather than adding beds to the area." Id.

¶87. The Alabama Supreme Court ultimately vacated the CON granted to Nolan because it held that the record did not contain sufficient evidence. *Shelby,* 564 So. 2d at 71. There was insufficient evidence because: 1) the project would have been "duplicative," and contrary to the cost containment goal of CON criteria; 2) evidence was present that "less costly, more efficient, or appropriate alternatives" were available; 3) "existing inpatient facilities with services similar to those proposed are not being used in an appropriate and efficient manner consistent with community demands"; 4) "alternatives to new construction have not been considered or implemented to the maximum extent practicable"; 5) "patients will not experience serious problems in obtaining inpatient care of the type proposed in the absence of the proposed new

service . . . . the services offered would duplicate those offered by existing facilities in the area." ***Shelby,*** 564 So. 2d at 69-70.

¶88. Comparable facts paralleling the cases are offered by the opponents as being precisely supportive of their position: 1) both have "some cost containment" as a CON criteria; 2) both projects are expected to cost $26,000,000; 3) a relocation of licensed unused beds is involved; 4) allegedly the services to be provided by MMC are duplicative as they were found to be in the ***Shelby*** case; and finally 5) the Alabama State Health Department and the MSDH approved the project because it was considered to not add new beds because it was a relocation of previously licensed beds. In light of the comparisons made between this case and ***Shelby***, opponents contend that the persuasive, yet admittedly not controlling, authority be adopted by the Court in its reversal of the MSDH's and chancellor's decision.

¶89. As the facts illustrate, this case and the ***Shelby*** case are similar. However, in the case sub judice, the hearing officer found and the State Health Officer agreed, which was supported by demographic testimony in the record, that need was present. They determined that in the city of Jackson, there were no other less costly alternatives. The hearing officer and State Health Officer also found that patient access would be enhanced by the project and that access to these proposed services would complement the existing system, not detract from it. Furthermore, although it is argued that the amount of emphasis on cost containment varies between Alabama and Mississippi, it is evident that Alabama gives more weight to this factor. MMC's expert Noel Falls testified that he has done a lot of health care work in Alabama and claims that Alabama places a much larger emphasis on cost containment than Mississippi because the number one priority in Mississippi is access to the underserved. Armstrong's testimony that providing for the uninsured and underserved is the greater factor than cost containment in Mississippi is further evidence of this fact. MMC distinguishes this case from ***Shelby*** by pointing out that different state health plans with correspondingly different goals are involved as mentioned in the previous sentences. Accordingly, this Court should find that the instant case is distinguishable from ***Shelby***. The Court should further find, as noted by the Concurrence in part/Dissent in part in ***Shelby***, that the ***Shelby*** Court apparently entered into its own fact finding and weighing of evidence to make its analysis which was contrary to its well established standard of review. ***Shelby***, 564 So. 2d at 71. Thus, considering the fact that the ***Shelby*** case is not controlling, this Court should refuse to adopt the holding taken by the Alabama Supreme Court.

¶90. MMC's additional support for its position that relocation of licensed beds is a standard and proper practice in the health care industry is the fact that Alabama Governor Wallace had issued Executive Order 28 on August 1, 1984, placing a moratorium on the filing, acceptance, and processing of CON applications, but subsequently issued another amendment that "the moratorium no longer prohibited the relocation of a health care facility if the relocation did not result in the addition of new beds or services." ***Shelby,*** 564 So. 2d at 65. Thus, MMC contends, and we should agree that ***Shelby*** is somewhat supportive of its position on this specific point despite the departure by the Alabama Supreme Court from its deferential standard of review. However, determining that the State Health Officer correctly defined "relocation", this argument is really of no consequence.

¶91. Finally, the opponents assert that the State Health Officer applied the wrong standard when he stated that "the true issue is whether or not there is *any specific advantage* in having the beds at a North campus, as opposed to leaving the authority where it is." (Emphasis added) MMC contends that this "myopic analysis of the State Health Officer's opinion is telling and constitutes a gross distortion of the opinion." It is alleged as a distortion because the State Health Officer did engage in a need analysis. The Court should find

this issue to be without merit because the State Health Officer properly determined that pursuant to the State Health Plan, this was a relocation which did not have service specific criteria. Additionally, the record reflects that need was considered, along with all other required criteria.

## CONCLUSION

¶92. In cases from administrative agencies, this Court must afford deference to the agency decisions and affirm the same *unless* they be arbitrary, capricious, or contain manifest error.

¶93. The statutorily, and heretofore judicially, undefined term of "relocation" appears to have been defined by the MSDH/State Health Officer in a manner consistent with past usage, and we should find that his definition does not violate the standard of review.

¶94. While this Court might not have found the same as the MSHD/State Health Officer, we should defer and affirm based upon the record before us. The MSDH/State Health Officer is the proper entity and person to define this previously statutorily undefined term, and he has done so in a manner consistent with prior practices of his agency and role. This agency and officer has been afforded deference in similar situations in the past, *Mississippi State Dep't of Health v. Golden Triangle Reg. Med. Ctr.*, 603 So. 2d 854, 857 (Miss. 1992)(MSDH afforded deference in defining undefined terms of the State Health Plan), and it does not appear that the standard of review was violated. *Mississippi State Dep't of Health v. Southwest Mississippi Reg. Med. Ctr.,* 580 So. 2d 1238, 1240 (Miss. 1991) (definitions of arbitrary and capricious).

¶95. MMC acted at its own peril by commencing operation of its facility well prior to the resolution of this litigation, perhaps prior to the oral argument had herein. While this situation is most bothersome to the Court, hindsight afforded by the standard of review would save this unwise gamble as to the commencement of operations. MMC's gamble of nearly Thirty Million Dollars ($30,000,000.00) well prior to final resolution of the conflict herein does little to reassure the courts and other supervisory authorities of its intent to fully comply with the law.

¶96. The decision of MMC to proceed prematurely, however and for whatever reason, is one which should not be repeated, and MMC and any and all other organizations and/or entities so tempted will do so at their own peril and expense and, conceivably, could face sanctions.

¶97. Recognizing the somewhat unusual factual situation involving a "relocation", the legislature may wish to address this issue in terms of future occurrences.

¶98. We like to believe that the health care industry strives to deliver the very best care possible to recipients (ultimately this includes us all), and does so on a cost effective basis. Yet, conflicts surely arise and the courts, generally not professionally trained in medicine and/or health care, must resolve those conflicts (often on a less than perfect basis) in behalf of providers and recipients. The affirmance of this case would save MMC from its initially unwise gamble, but only based upon the record supporting same and the applicable standard of review.

¶99. We, as consumers and taxpayers, ultimately bear all the costs, regardless of the allocation of any expense, and the health care industry is often damned if it does as well as if it does not (whatever). Some conflicts in the health care area surely may be avoided by both adherence to proper procedure and legislative enactment or amendment prior to litigation.

¶100. While it is difficult to totally disagree with the majority's reasoning, it is more difficult to spread this already unwise (perhaps) investment to patients and consumers who will receive nothing for the increased costs.

¶101. This case could be affirmed, and the money already invested and obligated could benefit patients and consumers, even with some form of sanctions for MMC. As it is, the proverbial rat hole is the beneficiary.

¶102. Very respectfully, I dissent.

**BANKS, J., JOINS THIS OPINION.**

**BANKS, JUSTICE, DISSENTING TO THE DENIAL OF THE MOTION FOR REHEARING:**

¶103. I dissent from the denial of this motion for rehearing for the reasons stated in the original dissent authored by Justice Roberts which I joined and for the additional reason that the brief in support of the motion has made clear that this Court engaged in unwarranted fact- finding with respect to this issue, perhaps overwhelmed by the fact that the new facility in question is located on what is thought to be the "affluent" side of I-55.

¶104. The fact is that this facility is located in a bustling commercial corridor in the midst of a myriad of establishments catering to the less affluent and middle class, including Target, Sam's Wholesale Club, Wal-Mart, Super K-Mart, car dealerships, inexpensive ethnic restaurants and the like. But a few miles to the north we find the true "affluent" side of Jackson, an inconsiderable amount of which is to the east of I-55 at that point: Ridgeland and Madison.

¶105. Few endeavors find it economically viable to cater solely to the indigent. Indeed, the absence of economic resources defines indigency. Location, therefore, even for those endeavors which would give emphasis to the provision of services to indigents, unless they are dedicated exclusively to that goal, must be such that will be attractive to non-indigents as well. The fact then, that this facility is located generally speaking in Northeast Jackson and east of I-55 should not be given the overwhelming significance that the majority implicitly, if not explicitly, attaches to it. Moreover, while consideration of the additional facts which Methodist attempts to bring to our attention concerning the actual patient load of the facility in operation would appear problematic under our usual standards, there is precedent for considering post-trial developments relevant to appellate resolution. ***Rogers v. Holder***, 636 So. 2d 645, 651 (Miss. 1994). Those facts demonstrate that this facility, in fact, serves a primarily minority and medicaid-eligible constituency.

¶106. Finally, even if we accept for the moment the majority's conclusion that the State Health Officer evaluated the facts based upon an improper standard, that conclusion should result in a remand for rehearing and evaluation using a proper standard. That there have already been two hearings is no justification for denying a third where we have overruled the administering agency as to an interpretation of the governing statutory scheme. It is for that agency, not this Court to administer the certificate of need

statutory scheme. While I recognize that our original decision grants considerable lattitude to the chancellor on remand, there should be no doubt that some re-evaluation in view of the proper standard and additional evidence of actual operation is permissible. Due process requires no less. *See **Estate of Robert Johnson v. Harris***, 704 So. 2d 819, 824 (Miss. 1997) (Banks, J., dissenting).

**ROBERTS, J., JOINS THIS OPINION.**

1. Hereinafter, MBMC and St. Dominic will be collectively referred to as "opponents" unless party distinction is necessary.

2. Woman's Hospital was initially involved but later, actually at the initial hearing, opted to allow MBMC and St. Dominic be the representative for their opposition to MMC's CON application. However, Woman's Hospital did have the transcribed testimony of its Assistant Administrator, David Jackson, from a previous River Oaks hearing, introduced on its behalf. Exhibit #19.

3. Hereinafter, MBMC and St. Dominic will be collectively referred to as "opponents" unless party distinction is necessary.

4. Relocate (verb)--To establish in a new place. To become established in a new place of business. --relocation (noun): source--American Heritage Dictionary of the English Language 1981 ed.

5. The Court does not intimate that cost containment arguments are without merit. However, we find that this factor should always be considered in conjunction with other factors.